IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| OLD REPUBLIC INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>        v.<br><br>MURPHY-BROWN, LLC and<br>SMITHFIELD FOODS, INC.,<br><br>    Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Old Republic Insurance Company ("Old Republic"), for its Complaint against Defendants Murphy-Brown, LLC ("Murphy-Brown") and Smithfield Foods, Inc. ("Smithfield") (collectively referred to herein as "Smithfield" or "Defendants," unless otherwise stated), alleges as follows:

## NATURE OF THE ACTION

1.      This is an insurance coverage dispute between Old Republic on the one hand, and Smithfield on the other.  The dispute concerns whether Old Republic has any insurance coverage obligations regarding certain insurance policies it issued to Smithfield, with respect to Smithfield's demands for defense and indemnity concerning an underlying lawsuit captioned *Jeannie Mae Barden, et al. v. Murphy-Brown, LLC and Smithfield Foods, Inc*., pending in the United States District Court for the Eastern District of North Carolina, Case No. 7:20-cv-00085-M (the "*Barden* Action").

2.      Plaintiffs in the *Barden* Action assert various claims against Defendants, including for nuisance and trespass, in connection with certain of Defendants' hog farm operations in North Carolina.

6872578.1

3.     The swine operation at issue in the *Barden* Action is a Large Concentrated Animal Feeding Operation ("CAFO") identified by permit number AWI310082, d/b/a Vestal Farm #1 and #2 (referred to herein as "Vestal" or "Vestal Farms"), with an address of 899-A NC Hwy 50 South, Magnolia, North Carolina 28453.

4.     The plaintiffs in the *Barden* Action allegedly have suffered injury and harm as a direct result of the tens of thousands of swine placed near their homes by Defendants, including but not limited to Defendants' hogs that generate feces and urine.

5.     Pursuant to Federal Rule of Civil Procedure 57, Old Republic seeks a declaratory judgment that it has no duty to defend and no duty to indemnify Defendants under certain primary commercial general liability ("CGL") and business automobile ("Auto") policies issued by Old Republic to Defendants, with respect to the *Barden* Action.

## THE PARTIES

6.     Old Republic is a Pennsylvania corporation with its principal place of business in Illinois. Old Republic is licensed to do business and is doing and transacting business in North Carolina.

7.     Upon information and belief, Defendant Murphy-Brown is a limited liability company organized under the laws of Delaware, with a principal place of business in Warsaw, North Carolina. Murphy-Brown's sole member is Smithfield Packaged Meats Corp. f/k/a John Morrell & Co. ("Smithfield Packaged Meats"). Smithfield Packaged Meats is a business corporation organized under the laws of Delaware, with its principal office located in Smithfield, Virginia. Smithfield Packaged Meats Corp. is a wholly owned subsidiary of Smithfield. Murphy-Brown, LLC is authorized to transact business and is doing and transacting business in the state of North Carolina.

2

6872578.1

8.      Upon information and belief, Defendant Smithfield is a business corporation organized under the laws of Delaware, with a principal place of business in Smithfield, Virginia. Smithfield is a wholly owned subsidiary of WH Group, a Chinese conglomerate.  Smithfield is authorized to transact business and is doing and transacting business in the state of North Carolina. Smithfield is the largest hog and pork producer in the world.

## JURISDICTION

9.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

### *Underlying Barden Action*

12.     The allegations set forth in this Section, titled "Factual Background – *Underlying Barden Action,*" are based on the allegations set forth in the complaint from the *Barden* Action, which is attached hereto as Exhibit ("Ex.") 1.  (Any reference to "plaintiffs" in this Section refers to the various plaintiffs in the *Barden* Action.)

13.     The complaint in the *Barden* Action identifies 19 plaintiffs, all of whom are residents of Kenansville and Magnolia, North Carolina.

14.     At the Vestal Farm at issue in the *Barden* Action, Smithfield owned, controlled, raised and/or managed swine in close proximity to plaintiffs' homes or other property.

3

15. Vestal houses over 20,000 "feeder to finish" swine, which generate many times more sewage than the entire nearby towns of Kenansville and Magnolia combined. Smithfield has failed to control the odor, urine, feces, manure, flies and other vectors that trespass onto plaintiffs' properties.

16. At Vestal, Smithfield still uses the outmoded "lagoon and sprayfield" system, which sprays nearby fields with liquefied manure fouling the rural landscape and causing noxious smells. Urine and feces on plaintiffs' property has caused periodic swarms of flies, insects and other pests. Large black flies periodically descend upon plaintiffs' properties, ruining and interfering with family activities, cookouts and other outdoor events. Other insects such as gnats come onto plaintiffs' land. The gnats and flies get stuck to windows and get inside the homes. Other vermin such as buzzards have come onto the properties. Often plaintiffs must clean manure off their cars and house windows because of the liquid manure spray that drifts in the wind, which is a direct result of Smithfield's failing to monitor and control operations at Vestal.

17. Smithfield's hogs also necessitate very large trucks, which crawl up and down the streets outside of plaintiffs' homes. These trucks shine bright lights from their headlamps, and often go by plaintiffs' homes in the dead of night causing noise, dust, liquid and dead animal parts to spill from the trucks onto plaintiffs' properties.

18. Dead hogs are from time to time placed in "dead boxes" that "are nothing more than dumpsters full of dead animals' rotting carcasses, and the revolting stench of death left out in the open in plain view"; the dead boxes attract buzzards, swarms of flies and vermin, which drop hog bones, rotting flesh, and other discarded swine body parts on plaintiffs' property.

6872578.1

19.     There are five primary causes of odor in CAFOs: the production facility, manure treatment and storage facilities, mortalities stored on site, land application, and liquid draining from Smithfield's trucks transporting either live or dead hogs.

20.     In multiple phases, urine and manure are injected into the air creating a "fecal mist" that travels to nearby residents.  Significant levels of airborne dust including particles from feed, manure, dander, and other particles are created in swine houses.  Dust is a transportation vehicle for manure particles and other gaseous odorants.  The dust absorbs gaseous odorants and manure that is transported to nearby residents.  This fecal matter attracts buzzards, flies and gnats that can carry disease.

21.     Thousands of hogs live in the swine houses. The hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floors into holding ponds below the floors that hold the raw feces and urine.  Stench rises from below the floors and throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure is blown out by large fans set in hog shed walls or by other means.

22.     When the dust, skin cells, dander, particulates, and dried fecal matter catch the wind, they travel to nearby residents' homes.  Many of the plaintiffs must wipe windows, cars, and other household possessions because of the airborne fecal matter.

23.     According to scientific studies, fecal dust can travel for miles in the air.  Further, fecal matter can carry more than 150 pathogens harmful to humans.  Swine houses remove fecal matter from their operations via ventilation fans because they can be harmful to the swine and especially to human workers.  However, by blowing the fecal matter out of the hog facility, it causes nearby residents to be burdened by the showering of fecal mist.

6872578.1

24.     The hog factories have a multitude of different ways to treat the harmful debris before discharge into the air.  Some of the hog factories have large fans at the end of the narrow facilities that suck the debris from the facility into the air.  Winds catch the debris and deposit the materials onto plaintiffs' properties.

25.     One of the other main causes of debris and fecal matter being deposited on plaintiffs' properties are the holding facilities for manure, better known as lagoons.  Lagoons are developed to house the millions of gallons of hog feces.  The liquid manure at farms like Vestal is stored in lagoons.  CAFOs discharge urine and feces from confinement buildings into the lagoons via pipes located above the lagoon surface.  Urine and feces fall through the air and splash into the lagoon, causing it to release odors and mist, which subsequently are transported in the wind.

26.     The manure and urine from the lagoons are spread on nearby fields.  Often this is done by a "traveling gun" system in which liquid is sprayed up into the air, and mist can drift off.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection or "knifing" the effluent into the ground can help lower odor, although Smithfield has not required this at most of its swine sites in North Carolina.

27.     Studies consistently show that lagoons emit toxic airborne chemicals that can result in major health problems.  CAFOs consistently disregard neighbors by exposing them to pollutants in manures and their residuals.  Further, it is well known in the swine industry that land application of manure from the lagoons causes odor.  When anaerobic manure is applied, odors, bacteria, particulates and other debris is deposited into the air where it will drift.

28.     Plaintiffs have suffered episodes of noxious and sickening odor, onslaughts of flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts,

6872578.1

gardening, lawn chores, the drifting of odorous mist and spray onto their land, inability to keep windows and doors open, and difficulty breathing and numerous other harms.

29.     North Carolina has recognized that lagoon and sprayfield systems are toxic. In fact, in 2007, the General Assembly passed a law making new lagoons and spray systems illegal; however, farms that already had permits were exempt from these standards. Vestal is one of the grandfathered farms still using the outmoded lagoon and sprayfield system.

30.     Smithfield and its predecessors, in placing tens of thousands of hogs at the facilities, acted in willful disregard to the harm known to be caused by the hogs. Over the years, Smithfield has continued to cause its hogs to create conditions that trespass onto plaintiffs' properties and cause injury without taking action to end the trespass despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the plaintiffs.

31.     Since the CAFO system was first started decades ago, studies, reports, incidents and complaints clearly show predictable conditions wherein dust, skin cells, dander, particulates, dried fecal matter have trespassed on plaintiffs' properties. However, Smithfield has not stopped the trespass, even after plaintiffs have complained.

32.     From the early 1990s to present, due chiefly to Smithfield's and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members and plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion.

33.     Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using Smithfield's old system due to the indisputable evidence of

harm and damage to neighbors. The spray and lagoon systems are toxic to the environment and cause constant trespass on plaintiffs' properties. The fecal mist is rampant and is not properly controlled by Smithfield. For decades upon decades, Smithfield has stated there is no technology that is better than lagoon and spray field in hog manure removal management.

34. The complaint in the *Barden* Action sets forth the following causes of action: Trespass; Negligence; Civil Conspiracy; Deceptive Trade Practices Act – N.C. Gen. Stat. § 75-1.1 ("UDTPA"); Unjust Enrichment by all Plaintiffs against all Defendants; and also seeks Punitive Damages and Injunctive and Equitable Relief.

35. The trespass cause of action is based on Defendants' alleged intentionally allowing and causing airborne dust, urine, particles from feed, manure, dander, and other manure contaminants to enter upon plaintiffs' properties, and to remain present on plaintiffs' properties. Further, flies, buzzards and other insects and vectors of disease scavenge on the vile manure contaminants which impair plaintiffs' enjoyment and use of their properties. Despite knowing that practicable technologies and methods are readily available to abate the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine created by the hogs, Defendants allegedly have failed to abate these conditions trespassing upon plaintiffs' properties. Defendants either were directly involved in material aspects of the hog facility operations, or exercised sufficient control to stand in a principal-agent relationship with the facility owners; Defendants also employed contract growers to do the offensive work.

36. The negligence cause of action is focused on Defendants' alleged negligence in allowing hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine to discharge, escape, or to be released from Vestal, and to travel to the properties owned or occupied by plaintiffs. Defendants allegedly (a) failed to take reasonable and adequate

8

precautions in operating their facilities to avoid airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine to travel onto plaintiffs' properties; (b) failed to timely and adequately test for the presence of airborne hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine within and outside their facilities' premises and on adjacent properties, including the plaintiffs' properties; (c) failed to warn plaintiffs of the hog manure, urine, dust, skin cells, dander, particulates, dried fecal matter, feed particles, and urine that would blow onto plaintiffs' properties despite having constructive knowledge; and (d) were negligent in other ways which may be shown through discovery.

37.     The civil conspiracy cause of action is based on Defendants' alleged agreements to participate in unlawful acts, including the creation of an intentional trespass; this includes misleading the public regarding the science and technology of hog manure removal.

38.     The UDTPA cause of action is based on Defendants' allegedly misleading the public and plaintiffs with respect to the technology of hog manure maintenance and removal, which lead to the contribution to and/or maintenance of trespass on plaintiffs' properties.

39.     The unjust enrichment cause of action is based on Defendants' alleged failure to incur costs and expenditures to limit or prevent the release of manure and contaminants on to plaintiffs' properties, as well as costs to investigate, mitigate and remediate the adverse impacts; and Defendants have received a measurable monetary benefit by failing to make those necessary expenditures.

40.     The punitive damages cause of action is based on Defendants' alleged recurring conduct, acts, omissions, negligence and impropriety, all of which allegedly were willful, wanton, malicious and in reckless disregard for the rights and interests of plaintiffs.

6872578.1

41.     The injunctive and equitable relief cause of action requests that in addition to monetary damages, Defendants must implement and continue measures to alleviate and abate the conditions alleged in the complaint.

***Defendants' Knowledge of Nuisance Claims Based on Prior Actions—2013 and 2014 State and Federal Lawsuits Involving Substantially Similar CAFO Nuisance Claims***

42.     Smithfield's subsidiary, Murphy-Brown, LLC, has been sued in twenty-six separate lawsuits currently pending in the United States District Court for the Eastern District of North Carolina.  The plaintiffs in those actions originally filed the lawsuits in various North Carolina state courts in 2013.  Those plaintiffs subsequently dismissed the state court complaints and immediately refiled in federal court in 2014 (referred to herein as the "Non-Vestal Underlying CAFO Lawsuits").

43.     The allegations in the Non-Vestal Underlying CAFO Lawsuits are substantially identical to the allegations set forth in the *Barden* Action.  For instance, those lawsuits generally allege damages as a result of the nuisance created by the hog farms, which includes foul odors and gases, insects and scavenger animals, dust, noise, and truck traffic.  There currently are over 500 plaintiffs in the lawsuits.

44.     For both company-owned farms and contract grower farms, Murphy-Brown controls the design of the hog farm facilities, and it controls the management of the hog farm facilities through standard operating procedures.  Among other things, Murphy-Brown decides when the hogs are brought to the farms and when the hogs leave the farm. Murphy-Brown supplies and delivers by trucks owned by Murphy-Brown all of the feed for the hogs.

45.     In the Non-Vestal Underlying CAFO Lawsuits, the parties agreed to select bellwether cases for discovery and trial.  Five cases were selected and scheduled for trial.  Each of

the bellwether cases that has been tried has resulted in an adverse jury verdict against Murphy-Brown, and the juries in four of the five bellwether trials awarded punitive damages to plaintiffs.

46.     During trial of one or more of the bellwether cases, there was testimony and admitted exhibits that supported the plaintiffs' allegations, including that odor from the hog waste, swarms of flies and other pests attracted to the hog waste, and buzzards attracted to dead hogs, have interfered with their use and enjoyment of their properties.

47.     Among other things, the plaintiffs in the Non-Vestal Underlying CAFO Lawsuits allege that in 2000, due to concerns about pig farm odors coming from "lagoons," North Carolina commissioned a multi-year study known as the "Smithfield Agreement," which concluded that there was economic feasibility for improvements.  Further, numerous scientific reports and studies have shown that Smithfield had actual knowledge of the nuisance caused by its swine or it was willfully blind to it.  Despite the availability of technologies and methods to abate the nuisance, Smithfield has failed to adopt new technologies and failed to abate the foul and offensive hog odors and other causes of nuisance.

48.     In in the Non-Vestal Underlying CAFO Lawsuits, there was nothing accidental about the harm to the neighbors of the hog farms of Murphy-Brown and its contract growers caused by the routine operations of the hog farms.  Murphy-Brown intentionally and routinely engaged its hog farm operations through a system of: (1) multiple swine houses holding hundreds or thousands of hogs, with concrete slatted floors that allow manure and feces to drop into cement collection pits; (2) a gravity or pump system that moves the hog waste into an open-air lagoon that typically is several acres in size; (3) management of the level of the lagoon to keep it from overflowing by spraying the waste through a high-powered hose onto nearby fields on the farm,

i.e., "sprayfields," in large quantities; and (4) management of hog mortalities though the use of "dead boxes" that are retrieved by trucks owned by Murphy-Brown.

49.     By way of further example, in the underlying *Gillis* trial, testimony and exhibits established that Smithfield knew about the deleterious effects its hog operations had on the neighbors and was aware of technologies, including but not limited to lagoon covers, that could mitigate the effects of the waste odor and alternative waste management methods but did not implement them.

50.     Similar testimony was presented to the juries in the four other bellwether trials that have taken place.  Instead of making changes, Murphy-Brown continued to use the swine house-lagoon sprayfield system on its company farms and the contract grower farms without making any changes to it, despite being aware since the 1990s of the public health problems caused by that system.

51.     Juries in four of the five underlying bellwether trials awarded punitive damages against Murphy-Brown, which required clear and convincing evidence that Murphy-Brown's officers, directors or managers engaged in "willful or wanton conduct," which, according to the jury instructions in the underlying *McGowan I* trial, means "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage or other harm."

52.     Smithfield and Murphy-Brown expected and were substantially certain that odors from many tons of hog waste generated by thousands and thousands of hogs, as well as flies and other pests attracted to the hog waste, would leave the boundaries of the hog farms and come onto the properties of the neighboring residents, and that trucks delivering feed, delivering hogs, taking away live hogs, and taking away dead hogs through residential streets would cause odor, dust,

noise, bright lights, and liquid spillage from the "dead trucks." Moreover, the underlying complaints allege and the bellwether trials and much other evidence made available through discovery or in the public record have shown that Smithfield knew or was substantially certain about the deleterious effects its hog operations had on the neighbors.

***Defendants' Additional Knowledge of Nuisance-Related Claims Since 1990s***

53.     The following paragraphs include additional examples of evidence establishing that the harm caused by Murphy-Brown's hog farm operations was not accidental because it was not unforeseen or unexpected.

54.     Smithfield and Murphy-Brown, as well as Carroll's Foods, Murphy Family Farms, and Brown's of Carolina, which became part of Smithfield, received numerous complaints from neighbors as early as the mid-1990s concerning foul odors emanating from the gigantic hog operations and dead trucks dripping liquid onto residential roadways.

55.     Former Murphy-Brown employee Don Butler, while he was an employee of Carroll's Foods, one of Murphy-Brown's predecessors in interest, attended an Intensive Animal Production Symposium in May 1995 held by the N.C. State University College of Agriculture & Life Sciences, where individuals spoke of swine farm odor affecting quality of life by altering individual and family activity, concerns about the proximity of hog farm operations to homes, and concerns about harmful health effects.

56.     Other public forums held in the late 1990s addressed concerns by citizens and environmental activists about the harmful effects of large-scale hog farm operations; Mr. Butler attended many of these forums, communicated with the other participants, and heard the complaints of neighbors of hog farms.

6872578.1

57.     Smithfield, Murphy-Brown, and their predecessors in interest were aware of, and had in their possession, a 1998 scientific study prepared by Dr. Susan S. Schiffman of Duke University entitled "Societal Expectations and Social Consequences Relative to Odor and Its Control" and which noted that the swine industry presents a number of inter-related social, economic, environmental and health related concerns, and that citizens and activists who were subjects of the study said that living with odor and flies from swine had dramatically affected their lives.

58.     Smithfield, Murphy-Brown, and their predecessors in interest were aware of, and had in their possession, an article entitled "Intensive Livestock Operations, Health, and Quality of Life Among Eastern North Carolina Residents, published in 2000 by Professor Steven Wing of the University of North Carolina that reported on his study showing that people who live near industrial swine operations have reported decreased health and quality of life related to airborne emissions emanating from swine houses, lagoons, and sprayfields.

59.     In 1999, then-North Carolina Governor Hunt established a "Framework for the Conversion of Anaerobic Swine Waste Lagoons and Sprayfields." When the Framework was released, Governor Hunt stated, "I have become convinced that lagoons need to be converted. We have seen too many problems with pollution of surface and ground water, odor, nutrient imbalance, and nitrates in the groundwater. Some of these issues need to be looked at more closely – but we can't wait to act."

60.     On July 25, 2000, the Attorney General of North Carolina, Smithfield Foods, Inc., Browns' of Carolina Inc., Carroll's Foods, Inc., Murphy Family Farms, and others entered into an agreement, known as the "Smithfield Agreement," which states in part that "the public interest will be served by the development and implementation of environmentally superior waste

management technologies [superior to lagoon and spray field system] appropriate to each category of hog farms in North Carolina," and that one of the goals of the Agreement is to "[s]ubstantially eliminate the emission of odor that is detectable beyond the boundaries of the parcel or tract of land on which the swine farm is located."

61.     Smithfield, through Don Butler, was an active participant in the committee that was formed to implement the directives of the Smithfield Agreement to find technologies that were environmentally superior to the lagoon and sprayfield system. As such, Smithfield was aware of the availability of technologies to mitigate the effects of the hog waste odors. However, Smithfield deliberately did not implement them.

62.     Additional similar prior nuisance actions have been filed against Defendants or their predecessors and subsidiaries based on similar hog growing operations in Missouri, Iowa, Utah, and North Carolina, demonstrating that Defendants had knowledge of the deleterious effects of hog growing operations on their neighbors prior to the filing of the underlying actions and would have expected or intended to cause the types of damages alleged to have been caused in the underlying actions.

63.     Further, Smithfield was sued in a class action complaint in 2001 in federal court in Florida on racketeering allegations that Smithfield "has in effect secured a stranglehold on American pork production through a pattern of illegal conduct that endangers the environment and the health, welfare, property, businesses, and quality of life of millions of Americans." In 2006, a Consent Decree was entered in the case entitled *Waterkeeper Alliance, Inc., et al. v. Smithfield Foods, Inc., Brown's of Carolina, LLC, Murphy-Brown, LLC, Murphy Farms, Carroll's Foods, et al.*, United States District Court, Eastern District of North Carolina, in which action plaintiffs alleged in part that "the current lagoon and sprayfield system [] is fundamentally flawed, and that

15

regular and continuous releases of pollutants to surface water, ground water, and the air from this system violate the CWA and RCRA, and pose a continuous, ongoing threat to human health and the environment in North Carolina."

64.     Further, litigation involving substantially similar if not the same operations from Missouri resulted in litigation and settlement in 2010 or so.

## THE OLD REPUBLIC INSURANCE POLICIES

65.     The following Old Republic policies are at issue: Old Republic Commercial General Liability policy nos. MWZY 312999, effective April 30, 2018 to April 30, 2019 and MWZY 312999 19, effective April 30, 2019 to April 30, 2020; and Old Republic Auto Liability policy nos. MWTB 312998, effective April 30, 2018 to April 30, 2019 and MWTB 312998 19, effective April 30, 2019 to April 30, 2020.  (These policies are collectively referred to herein as the "Old Republic Policies," and are attached hereto as Exs. 2, 3, 4 and 5, respectively.)

### *Old Republic General Liability Policies*

66.     Old Republic Commercial General Liability ("GL") (Occurrence) policy no. MWZY 312999, effective from April 30, 2018 to April 30, 2019 (the "GL Policy"), identifies the named insured as "Smithfield Foods, Inc. (See Form GL 454 001 0411)" with limits of $5,000,000 each occurrence, and $8,000,000 general aggregate limit.

67.     The GL Policy contains a Scheduled Deductible Coverage Endorsement (CG EN GN 0107 01 12) identifying the following Deductible: "$ Equals the Limits of Insurance/Liability as provided under the policy plus all ALAE/Supplemental Payments."  That endorsement also states, "Our obligations to pay damages apply only to the amount of damages in excess of the deductible shown in the Schedule." It further states that the deductible may be satisfied by any combination of damages, and other amounts payable under the policy, but that amounts payable

16

under Supplementary Payments (which include but are not limited to allocated loss adjustment expenses (ALAE)) do not satisfy the deductible. It further states, "In addition to the Scheduled deductible you are responsible for payment of Supplementary Payments and/or [ALAE]." Deductible amounts representing damages and other amounts payable under the policy will reduce the applicable Limits of Insurance / Limits of Liability, but ALAE / Supplementary Payments do not reduce the applicable limits.

68.     The Insuring Agreement of Coverage A, Bodily Injury and Property Damage Liability (Coverage Form CG 00 01 04 13) in the GL Policy states in relevant part as follows:

**1.      Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        **(1)**    The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

        **(2)**    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**    **The "bodily injury" or "property damage" is caused by an "occurrence"** that takes place in the "coverage territory";

        **(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)**    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such

a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

*     *     *

**d.**    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

    **(1)**    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    **(2)**    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

    **(3)**    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

(Emphasis added.)

69.    The GL Policy contains the following exclusions:

**2.**    **Exclusions**

This insurance does not apply to:

    **a.**    **Expected Or Intended Injury**

    "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

*     *     *

    **f.**    **Pollution**

    **(1)**    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        **(a)**    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

            **(i)**    "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

18

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site

or location with the intent that they be discharged, disperse or released as part of the operations being performed by such insured, contractor or subcontractor.

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g.** **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring,

20

employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

\*  \*  \*

70. An "Expected Or Intended Injury Changes" endorsement replaces Exclusion (a) with the following: "**a. Expected Or Intended Injury** – 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to 'bodily injury' or 'property damage' resulting from the use of force to protect persons or property."

71. The GL Policy contains the following definitions:

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*  \*  \*

**13.** **"Occurrence" means an accident**, including continuous or repeated exposure to substantially the same general harmful conditions.

\*  \*  \*

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*  \*  \*

(Emphasis added.)

72. A "Bodily Injury Definition Extension/Mental Injury Coverage" endorsement replaces the above definition with the following: "'Bodily injury' means bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, discrimination, alienation of affections, emotional distress, sickness or disease sustained by a person, including death resulting from any of these at any time."

73. Old Republic GL policy no. MWZY 312999 19 (April 30, 2019 to April 30, 2020) contains the same Coverage Form (CG 00 01 04 13) and the same Scheduled Deductible Coverage Endorsement (CG EN GN 0107 01 12) as the GL Policy (2018-2019).

*Old Republic Business Auto Liability Policies*

74.     Old Republic Business Auto policy no. MWTB 312998, effective from April 30, 2018 to April 30, 2019 (the "Auto Policy"), identifies the named insured as "Smithfield Foods, Inc. (See Form CA 454 002 0411)" with liability limits of $3,000,000 for covered autos. The Auto Policy contains a Scheduled Deductible Coverage Endorsement identifying a deductible of $1,000,000 (CA E NGN 0049 10 13).

75.     The Auto Policy contains the following Insuring Agreement (2009 ISO form CA 00 01 03 10) (the 2019-2020 auto policy contains substantially similar wording):

**SECTION II – LIABILITY COVERAGE**
**A.     Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, **caused by an "accident"** and resulting from the ownership, maintenance or use of a covered "auto". [Emphasis added.]

\*         \*         \*

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

76.     The Auto Policy contains the following exclusions:

**2.     Exclusions**

This insurance does not apply to any of the following:

**1.     Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

\*         \*         \*

**11.    Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.**      That are, or that are contained in any property that is:

22

6872578.1

       **(1)**    Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

       **(2)**    Otherwise in the course of transit by or on behalf of the "insured"; or

       **(3)**    Being stored, disposed of, treated or processed in or upon the covered "auto";

   **b.**    Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

   **c.**    After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

\*     \*     \*
\*     \*     \*

77.    The Auto Policy contains the following Definitions:

**A.**    "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.**    **"Auto"** means:

   **1.**    A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

   **2.**    Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

**C.**    **"Bodily injury"** means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

\*     \*     \*

**L.**    "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*     \*     \*

78.    An Amended Definition of Bodily Injury endorsement defines "Bodily injury" to mean "physical injury, mental anguish, mental injury, shock, humiliation, sickness or disease sustained by a natural person, including death resulting from any of these at any time."

79.    An Expected Or Intended Injury Coverage endorsement defines "Expected Or Intended Injury" as "'Bodily injury' or 'property damage' expected or intended from the standpoint of the 'insured'. Notwithstanding anything else in this policy to the contrary, this

exclusion does not apply to 'bodily injury' or 'property damage' resulting from the use of force to protect persons or property."

80.      A Pollution Liability – Broadened Coverage for Covered Autos endorsement makes certain changes to the pollution exclusion above, including to specify that paragraph a. applies only to liability assumed under a contract or agreement.

81.      The 2019-2020 auto policy also contains the endorsements identified above in the Auto Policy (2018-2019).

***Old Republic Program Agreement***

82.      A Program Agreement applies to each insurance policy issued by Old Republic to Smithfield.  (A copy of the Program Agreement is attached hereto as Ex. 6.)

83.      The Program Agreement executed by Smithfield also contains, among other things, Smithfield's obligations for the handling of, defending, funding of and reporting on claims.  The Program Agreement and the Old Republic Policies together constitute the entire agreement between Smithfield and Old Republic.

84.      Schedule A of the Program Agreement <u>effective April 30, 2018 to April 30, 2019</u> identifies the following information for "Insured Retention": (1) GL – 100% of Loss and ALAE – "ALAE is in addition to the Policy Limits.  ALAE is retained by the Insured in addition to the Insured's Retention for Loss.  The Insured is responsible for all ALAE and all Loss under the Policy"; and (2) Auto –1st $1,000,000 Per Accident – "ALAE is inside the Insured's Retention and in addition and not subject to the Policy Limits.  The Insured is responsible for all ALAE and all Loss under the Policy up to, but not exceeding, the Insured's Retention."

85.      Schedule A of the Program Agreement <u>effective April 30, 2019 to April 30, 2020</u> identifies the following information for "Insured Retention": (1) GL – 100% of Loss and ALAE –

"ALAE is in addition to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. The Insured is responsible for all ALAE and all Loss under the Policy" [same as 2018-2019]; and (2) Auto –1st $1,000,000 Per Accident – "ALAE is in addition to and not subject to the Policy Limits. ALAE is retained by the Insured in addition to the Insured's Retention for Loss. Notwithstanding any provision contained herein or in the Policy to the contrary, in the event a Loss[s] is payable under the Policy, the Insured agrees and acknowledges the Policy provides no coverage for ALAE. For the avoidance of doubt, the parties agree the Company is not obligated in any way to share in or provide payment/reimbursement for any ALAE be it on a pro-rata, proportionate or any other basis. The Insured is responsible for one-hundred percent [100%] of any and all ALAE under the Policy" (emphasis added).

## FIRST CAUSE OF ACTION
### FOR DECLARATORY JUDGMENT THAT OLD REPUBLIC HAS NO DUTY TO DEFEND DEFENDANTS RELATING TO THE *BARDEN* ACTION

86.     Old Republic repeats and incorporates by reference Paragraphs 1 through 85 of its Complaint as if fully restated here.

87.     Old Republic does not owe Defendants a duty to defend in the *Barden* Action for the following reasons:

        a.      The *Barden* Action does not seek damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" as those terms are defined in the Old Republic Policies.

        b.      Even if the *Barden* Action sought damages because of "bodily injury," which Old Republic does not admit, that "bodily injury" was not caused by an "occurrence" or an "accident" as defined in the Old Republic Policies.

c. Even if the *Barden* Action sought damages because of "bodily injury," which Old Republic does not admit, that "bodily injury" was expected or intended from the standpoint of one or more Defendants.

d. Even if the *Barden* Action sought damages because of "bodily injury," which Old Republic does not admit, that "bodily injury" was known prior to the inception or effective date of each of the Old Republic Policies.

e. Even if the *Barden* Action sought damages because of "property damage," which Old Republic does not admit, that "property damage" was not caused by an "occurrence" or an "accident" as defined in the Old Republic Policies.

f. Even if the *Barden* Action sought damages because of "property damage," which Old Republic does not admit, that "property damage" was expected or intended from the standpoint of one or more Defendants.

g. Even if the *Barden* Action sought damages because of "property damage," which Old Republic does not admit, that "property damage" was known prior to the inception or effective date of each of the Old Republic Policies.

88. An actual controversy now exists between Old Republic and Defendants concerning whether the Old Republic Policies require Old Republic to defend Defendants in the *Barden* Action.

89. Pursuant to 28 U.S.C. § 2201 *et seq.*, Old Republic seeks a judicial declaration that under the terms of the Old Republic Policies, there is no duty to defend Defendants in the *Barden* Action.

## SECOND CAUSE OF ACTION
## FOR DECLARATORY JUDGMENT THAT OLD REPUBLIC HAS NO DUTY TO INDEMNIFY DEFENDANTS RELATING TO THE *BARDEN* ACTION

6872578.1

90.     Old Republic repeats and incorporates by reference Paragraphs 1 through 85 of its Complaint as if fully restated here.

91.     For the same reasons set forth in the First Cause of Action, Old Republic contends that the Old Republic Policies do not impose an obligation to indemnify Defendants in connection with the *Barden* Action.

92.     An actual controversy now exists between Old Republic and Defendants concerning whether the Old Republic Policies require Old Republic to indemnify Defendants in connection with the *Barden* Action.

93.     Pursuant to 28 U.S.C. § 2201 *et seq.*, Old Republic seeks a judicial declaration that under the terms of the Old Republic Policies, there is no duty to indemnify Defendants in connection with the *Barden* Action.

## PRAYER FOR RELIEF

WHEREFORE, Old Republic respectfully requests that the Court:

a)      Order a trial by jury of all of Plaintiff's claims that are so triable;

b)      Enter a judgment in favor of Old Republic and against Murphy-Brown and Smithfield on the First Cause of Action;

c)      Enter a judgment in favor of Old Republic and against Murphy-Brown and Smithfield on the Second Cause of Action;

d)      Enter a judgment awarding Old Republic all of its reasonable attorneys' fees, costs and expenses incurred in this action; and

e)      Grant such other further relief as this Court may deem just and proper.

This the 29th day of October, 2020.

MANNING, FULTON & SKINNER, P.A.

_____/s/ Michael T. Medford_____.
Michael T. Medford
N.C. State Bar No. 7227
3605 Glenwood Avenue, Suite 500 (27612)
Post Office Box 20389
Raleigh, NC 27619
Telephone: (919) 787-8880
Facsimile: (919) 325-4618
E-mail: medford@manningfulton.com
Local Civil Rule 83.1(d) Counsel


_____/s/ Michael L. Duffy_____.
Amy R. Paulus (admitted *pro hac vice*)
Michael L. Duffy (admitted *pro hac vice*)
Local Rule 83.1
CLAUSEN MILLER, P.C.
10 S. LaSalle Street
Chicago, IL 60603
Telephone: (312) 606-7573
Facsimile: (312) 606-7777
E-mail: apaulus@clausen.com
           mduffy@clausen.com
Local Civil Rule 83.1(e) Special Appearance
Counsel

*Attorneys for Defendant*
*Old Republic Insurance Company*

6872578.1